UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AARON LAMONT STRIBLING,

       Plaintiff,

    v.

DR. K. BROCK, et al.,

       Defendants.

Case No. 15-cv-03336-YGR (PR)

**ORDER DENYING PLAINTIFF'S MOTION TO STRIKE REPLY; AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Plaintiff Aaron Lamont Stribling, a state prisoner currently incarcerated at California State Prison - Sacramento, has filed a *pro se* civil rights complaint under 42 U.S.C. § 1983 stemming from constitutional violations that took place at Salinas Valley State Prison ("SVSP"), where he was previously incarcerated.  Specifically, Plaintiff alleges a claim of deliberate indifference to medical needs against two SVSP psychologists, Drs. K. Brock and R. Mahan, stemming from inadequate mental health treatment in 2013.  Dkt. 1 at 3.

The parties are presently before the Court on Defendants' Motion for Summary Judgment.  Dkt. 16.  Plaintiff has filed an opposition to Defendants' motion, and Defendants have filed a reply.  Dkts. 24,[1] 25.  Plaintiff has also filed a motion to strike Defendants' reply brief.  Dkt. 26.

For the reasons stated below, Plaintiff's motion to strike is DENIED, and Defendants' motion for summary judgment is GRANTED.

## II.  PLAINTIFF'S MOTION TO STRIKE

Plaintiff has moved to strike Defendants' reply brief as untimely.  Dkt. 26.

Defendants' reply brief is properly understood as a reply brief in support of their motion for summary judgment.  Litigants may file reply briefs in support of their motions wherein they

---

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.  In addition, Plaintiff's opposition includes one page (a paragraph was crossed out and the remaining words are illegible) that he has seemed to have inserted inadvertently in the middle of the opposition, which will not be considered but will be included in the page count because it was e-filed with the rest of the opposition.  Dkt. 24 at 6.

United States District Court
Northern District of California

address arguments raised in oppositions to their motions and they reemphasize arguments set forth in their motions. Such a reply brief is authorized by both Local Rule 7-3(c) and by the Court's January 12, 2016 Order of Partial Dismissal and Service, which set forth a briefing schedule. Dkt. 4 at 4-6. The Court's briefing schedule required Defendants to file a reply brief "no later than **fourteen (14) days** after the date Plaintiff's opposition is filed." *Id.* at 6 (emphasis in original). Plaintiff claims that his opposition was "filed" on "7-11-16." Dkt. 26 at 1. However, the record shows that he merely signed his opposition on that date. Dkt. 24 at 9. Plaintiff's opposition was stamped as "FILED" by the Clerk of the Court on July 15, 2016. Dkt. 24. Defendants' reply was filed on July 29, 2016—fourteen days after Plaintiff's opposition was *filed*. Dkt. 25. Therefore, the Court finds that Defendants' reply brief was timely filed. Accordingly, the Court DENIES Plaintiff's motion to strike and will consider the substance of Defendants' reply.

## III.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.   Factual Background[2]

#### 1.  The Parties

At the time of the events set forth in his complaint, Plaintiff was a state prisoner who was incarcerated at SVSP. Dkt. 1 at 1. Also during the same time frame, Defendants were clinical psychologists at SVSP. Mahan Decl. ¶ 1; Brock Decl. ¶ 1.

---

[2] This Order contains many acronyms. Here, in one place, they are:

| | |
|---|---|
| ad-seg | Administrative Segregation |
| ADHD | Attention Deficit Hyperactivity Disorder |
| AH | Auditory Hallucinations |
| CO | Custody Officer |
| CTC | Correctional Treatment Center |
| DSH | Department of State Hospitals |
| EOP | Enhanced Outpatient Program |
| IDTT | Interdisciplinary Treatment Team |
| LOC | Level of Care |
| MH | Mental Health |
| MHCB | Mental Health Crisis Bed |
| MHDS | Mental Health Delivery System |
| NOS | Not Otherwise Specified |
| OD | Overdose |
| SI | Suicide Ideation |
| TTA | Triage and Treatment Area |
| VH | Visual Hallucinations |

United States District Court
Northern District of California

2

### 2.  Plaintiff's Version

The following is taken from the Court's January 12, 2016 Order of Partial Dismissal and Service:

> Plaintiff claims that on August 23, 2013, he attempted suicide and was "sent to the crisis bed" area for eleven days.  Dkt. 1 at 3.  However, Plaintiff alleges Defendants Brock and M[a]han kept trying to discharge him, only to have him return after attempting to commit suicide on two more occasions after being discharged on September 3 and 4, 2013.  Plaintiff claims that these Defendants "purposely discharged [him] wrongfully because they needed more room for other inmates that were suicidal."  *Id.*

Dkt. 4 at 3.

After liberally construing Plaintiff's aforementioned allegations that Defendants failed to provide adequate mental health treatment, the Court found that Plaintiff stated a cognizable deliberate indifference claim.  *Id.*

### 3.  Defendants' Version

#### a.  The CDCR's Mental Health Care Program

The California Department of Corrections and Rehabilitation's ("CDCR") program for mental health encompasses four levels of mental health treatment, which include (in order from the lowest to highest level of treatment), the Correctional Clinical Case Management System, the Enhanced Outpatient Program ("EOP"), the Mental Health Crisis Bed ("MHCB"), and the California Department of Mental Health.  *Williams v. Kernan*, 2009 WL 2905760, *1 (E.D. Cal. 2009).

The appropriate level of care for an inmate is based upon his level of functioning.  *Id.*  An inmate's level of functioning is determined by the severity of his symptoms, his ability to conduct self-care, his ability to participate in activities of daily living, and his general adaptation to the prison environment.  *Id.*

The EOP is the most intensive level of outpatient care for mentally ill inmates, involving a separate housing unit and structured activities for inmates who have difficulty housing in general population but do not require inpatient hospitalization.  Brock Decl. ¶ 2.  Inmates at the EOP level of care receive increased clinical and custodial support, including comprehensive mental health services.  *Id.*

United States District Court
Northern District of California

The MHCB unit provides an elevated level of care to inmates who are experiencing acute psychiatric symptoms leading to marked impairment and dysfunction, dangerousness to others, or dangerousness to self. *Id.* ¶ 3. At SVSP, the MHCB is located within the prison's inpatient medical facility—the Correctional Treatment Center ("CTC")—and offers 24-hour mental health care to inmates who need it. *Id.* CDCR employees who become aware of an inmate's "suicidal ideation" (i.e., suicidal thoughts), threats, or an attempt to commit suicide are required to notify mental health staff immediately. *Id.* ¶ 4. The inmate will then receive a suicide-risk assessment by a qualified mental health clinician on an emergency basis. *Id.*

Inmates expressing "suicidal ideation" are initially placed in a holding cell in the CTC. *Id.* ¶ 5. A triage nurse conducts a preliminary evaluation of the inmate's mental and physical status and refers the inmate for an MHCB admission evaluation. *Id.* The triage nurse may also put the inmate on suicide precaution, which means the inmate is at high risk of attempting self-injurious behavior, but is not in immediate danger. *Id.* The inmate is provided with a safety smock, a safety blanket, as well as a safety mattress, and the inmate will receive checks by nursing staff every fifteen minutes until the inmate is either admitted to MHCB or cleared for release back to the housing unit. *Id.*

The MHCB admission evaluation is conducted face-to-face by a clinician who has been trained to conduct suicide-risk assessments. *Id.* ¶ 6. Such assessments include consideration of certain static, long-term, short-term, and protective risk factors, using the clinician's best clinical judgment, and the results are recorded on a Suicide Risk Evaluation form. *Id.* Inmates who are at significant suicide risk are admitted to the MHCB for further mental health treatment, stabilization, and suicide prevention. *Id.* Once an inmate no longer presents a significant suicide risk, he can be discharged from the MHCB. *Id.* Admission to MHCB is not contingent on available bed space at a particular institution; if the beds are full, the inmate will be kept under observation and transferred to an MHCB at a different institution. *Id.*

### b. Plaintiff's Mental Health Treatment

For many years, Plaintiff has been a participant in CDCR's Mental Health Services Delivery System, also known as the Mental Health Delivery System ("MHDS"). Mahan Decl. ¶ 2.

United States District Court
Northern District of California

In 2013, Plaintiff was receiving mental health treatment at the EOP level of care.  *Id.*  In April 2013, after receiving a Rules Violation Report for "Battery on an inmate with serious bodily injuries," Plaintiff was placed in administrative segregation ("ad-seg").  Van Loh Decl., Ex. C, Plaintiff's Dep. 44:6-22.  On June 19, 2013, a mental health treatment team, called the Interdisciplinary Treatment Team ("IDTT"), consisting of two psychologists, a psychiatrist, a psychiatric technician, and a correctional counsel (none of which are named as Defendants in this action), conducted a comprehensive evaluation of Plaintiff, and on June 24, 2013, they drafted a 3-page "Mental Health Treatment Plan."  Mahan Decl. ¶ 2; Van Loh Decl., Ex. B at 1-5.  The team noted his diagnoses of "Mood Disorder, NOS [not otherwise specified]," "Antisocial Personality Disorder," and "Narcissistic Personality Disorder."  Van Loh Decl., Ex. B at 3.  The team also noted as follows:

> . . . [Plaintiff] came to [ad-seg] for battery on an IM [inmate]. Recently, there has been no indication of delusional thinking or psychological thought process.  Previous clinicians indicated that the psychotic symptoms which he presented were questionable. [Plaintiff] has a history of being evasive when asked about specifics of AHs [auditory hallucinations] or VHs [visual hallucinations]. Additionally, [Plaintiff] has frequently been observed to be laughing and joking with other inmates, often immediately before or after he has reported being severely depressed to his clinicians.  It is unlikely that [Plaintiff] will require or benefit from long term EOP placement.  According to his last clinician on the EOP yard, [Plaintiff] progressed in his level of functioning and was close to reaching maximum benefits from the EOP MHDS.  [Plaintiff] has proven to be a strong advocate for himself when needing services from custody, medical as well as mental health.  [Plaintiff] is prescribed Strattera.[3]  Housing COs [custody officers] report that [Plaintiff] has been "quiet" since coming to [ad-seg].  Current clinical issues include mood instability and anger management.  He has had a poor MH [mental health] treatment compliance during the last 6 months.  [Plaintiff] has no history of suicide attempts.  . . . .

*Id.* at 1 (footnote and brackets added).

Based on progress notes, written by his primary clinician Dr. A. Capre, dated from June 20, 2013 through the morning of August 23, 2013, Plaintiff reported no acute psychiatric symptoms and denied having suicidal thoughts.  Mahan Decl. ¶ 3; Van Loh Decl., Ex. B at 6-16.

United States District Court
Northern District of California

---

[3] Plaintiff was prescribed Strattera to treat his attention deficit hyperactivity disorder ("ADHD").  Van Loh Decl., Ex. B at 34.

On July 19, 2013, Plaintiff informed Dr. Capre as follows: "I don't have any problems with my mental health.  All of my problems are with the administration and the court."  Van Loh Decl., Ex. B at 10.

On August 16, 2013, Plaintiff reported that he was having problems with custody officers, and he described the stress from interacting with these officers as "unbearable."  *Id.* at 15. Plaintiff asked Dr. Capre for a transfer to the Department of State Hospitals ("DSH") to address his anger problems, and Plaintiff "became irritated" when informed that his level of care would be decided by the "treatment team including psychiatry and custody."  *Id.*  A week later, on August 23, 2013 at around 10:30 a.m., Plaintiff again asked Dr. Capre about transferring to DSH.  *Id.* at 16.  When she refused, responding that Plaintiff was "functioning higher than a person who would be sent to DSH," he "became angry and asked to return to his cell."  *Id.*  Dr. Capre noted that, at that time, Plaintiff did not report that he was having suicidal thoughts.  *Id.*

### 1)  August 23, 2013 – Alleged Suicide Attempt and Admission to MHCB

On August 23, 2013 at approximately 9:15 p.m., Plaintiff was brought to CTC after notifying custody staff that he was having suicidal thoughts.  Brock Decl. ¶ 9; Van Loh Decl., Ex. B at 17, 20.  Plaintiff "walk[ed]" to CTC to be examined by the triage nurse, V. Welzenbach, R.N., and he reported as follows: "I feel like taking myself out before someone else does."  Van Loh Decl., Ex. B at 17.  The nurse's notes under "TRAUMA" indicates that Plaintiff "DENIE[D]" any injury at that time.  *Id.*  The nurse further noted that Plaintiff was "ALERT" and "OBEY[ED] COMMANDS."  *Id.*  Plaintiff was referred to the MHCB for an admission evaluation and retained in a separate holding area (as the holding cells at CTC were filled) until he could be evaluated by a clinician trained to conduct suicide evaluations in the morning.  Van Loh Decl., Ex. B at 18, 20. He was placed on suicide precaution and given a safety smock, safety blanket, as well as a safety mattress.  *Id.* at 18.  During this time, Plaintiff received periodic checks by nursing staff, which indicated that he showed "no distress" while he waited to be evaluated.  *Id.* at 20.  According to the Triage and Treatment Services Flow Sheet notes from August 23, 2013 at 12:00 a.m. through August 24, 2013 at 9:15 p.m., Plaintiff displayed "no self-harm" and "no distress" while he was at the holding area.  *Id.* at 20.

At approximately 9:15 a.m. on August 24, 2013, a clinician named Dr. R. Sardy evaluated Plaintiff.  Mahan Decl. ¶ 4; Van Loh Decl., Ex. B at 20.  According to the Suicide Risk Evaluation conducted by Dr. Sardy, Plaintiff reported with no supporting evidence that he had been "hoarding medication" and "took 'a lot' of pills 'overdosing' last night in front of medical [staff]."  Mahan Decl., Ex. A at 1-2, 19.  However, Plaintiff was "not sent to outside hospital and there was no medical evidence of OD [overdose]."  *Id.* at 40.  Dr. Sardy continued "suicide precaution"  *Id.*  Dr. Sardy also completed a Mental Health Evaluation, in which he stated that Plaintiff "reported intent to engage in self-harm" and "that [Plaintiff] had a plan but would not discuss [it]."  *Id.* at 3 (brackets added).  At 10:35 a.m., Dr. Sardy approved Plaintiff for admission to the MHCB.  Van Loh Decl., Ex. B at 19.  According to the Triage and Treatment Services Flow Sheet notes and Interdisciplinary Progress Notes from August 23, 2013 at 10:25 a.m. through August 24, 2013 at 3:15 p.m., Plaintiff displayed "no self-harm" while was at the holding area prior to his transfer to MHCB.  *Id.* at 20; Mahan Decl., Ex. A at 16.

According to Plaintiff's Admission Assessment at MHCB dated August 24, 2013 at 3:15 p.m., his aforementioned suicidal "plan" was "to take a lot of pills . . . ."  Mahan Decl., Ex. A at 6, 7.  According to the Nursing Care Record dated August 24, 2015, Plaintiff was moved to his cell at MHCB and showed "no distress" and "no sign of self-harm."  *Id.* at 12, 16.  According to the Restraint/Seclusion Record, Plaintiff was placed on suicide precaution with checks by nursing staff every fifteen minutes beginning as soon as he was transferred to MHCB on August 24, 2013 at 3:15 p.m. through August 26, 2013 at 1:45 p.m., and he showed "no sign of self-harm."  *Id.* at 17-18, 20-23, 27, 31-33, 36.

On August 26, 2013 around 2:00 p.m., Plaintiff underwent another IDTT review, and this time the team included Plaintiff's primary clinicians, Defendants Brock (who also served as IDTT leader) and Mahan.  *Id.* at 33, 36, 39.  The team drafted another 3-page "Mental Health Treatment Plan."  *Id.* at 40-42.  The team again noted his diagnoses of "Mood Disorder, NOS," "Antisocial Personality Disorder."  *Id.* at 42.  The team also noted as follows:

> . . . [Plaintiff] was admitted to the MHCB after making statements of self-harm and that he's been hoarding medications and subsequently "I took a lot of pills" in front of medical staff.  He was not sent to

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

[an] outside hospital and there was no evidence of OD. Upon admission, he stated, "I can't take it anymore and I fell [sic] like taking myself out before someone else does." The [treatment] note after admission indicates improvement in mood and that [Plaintiff] was focused on herring a housing change. When interviewed today, he explained that certain custody officers were "out to get me cause I file a lot of lawsuits and 602's." He also stated he fears they will kill him and make it look like a suicide. He denies thoughts of self-harm today and was more focused on problem[] solving about housing. His mood appeared anxious, no evidence of thought disorder, though he may be paranoid. He has a history of 1 MHCB admission for stated SI [suicidal ideation] secondary to frustration over an extended [ad-seg] placement. He carries a diagnosis of Mood disorder, NOS and has reported psychotic symptoms, which are questionable. He has also been diagnosed with Narcissistic and Antisocial Personality disorder. He was recently discharged from the EOP program (6/2013) after reaching "maximum benefit" and cessation of depressive symptoms. He has no history of suicide attempt. Plan is to assess/treat at MHCB LOC [level of care] to determine risk of self-harm and stabilize mood. He confirmed he didn't attempt suicide [and stated], "I just needed to vacate the premises."[4]

12   *Id.* at 40 (footnote and brackets added). According to the IDTT-Level of Care Decision dated

13   August 26, 2013, Plaintiff was to remain at his current placement at the MHCB after his IDTT

14   review[5] and was "not being referred to a higher LOC because [he] is being treated and evaluated at

15   the MHCB and DSH placement is being considered . . . but not indicated until further clinical

16   assessment is conducted including medication adjustment." *Id.* at 43. The specific treatment

17   modifications to the treatment plan were as follows: "medication management (as applicable) and

18   individual psychotherapy, continued assessment of risk of self-harm and veracity/severity of slated

19   symptoms." *Id.*

20        According to the Nursing Care Records, Plaintiff was monitored frequently (a time frame

21

22        [4] The Court notes that the last sentence is handwritten at the end of this typed summary. Mahan Decl., Ex. A at 40. In his opposition, Plaintiff refers to this last statement and claims that he "never did make that statement." Dkt. 24 at 3. Plaintiff also points to Dr. Sardy's Suicide Risk Evaluation dated August 24, 2013 in which the box is checked next to "Recent serious suicide attempt." *Id.* at 3 (citing Mahan Decl., Ex. A at 1). Dr. Sardy did not further elaborate and failed to mention any recent suicide attempt under the section labeled, "Additional Details." *Id.* at 2. Instead, Dr. Sardy indicated that Plaintiff was being evaluated because he made a statement that he was suicidal. *Id.*

23

24

25

26

27        [5] In Plaintiff's Mental Health Plan dated August 26, 2013, next to the section labeled, "VII. TRANSFER/DISCHARGE TO:" the box next to "EOP" was incorrectly checked. Mahan Decl., Ex. A at 40. The record shows that Plaintiff remained in the MHCB after his IDTT review. *Id.* at 43.

28

*United States District Court*
*Northern District of California*

that ranged from every one to two hours) beginning after his IDTT review on August 26, 2013 at 2:30 p.m. through September 3, 2013 at 3:30 p.m., and he showed neither signs of distress nor self-harm. *Id.* at 33, 36, 46, 49, 50, 52, 53, 60, 61, 64, 65, 68, 69, 72, 74, 76, 77. He was also interviewed daily by various clinicians, including Defendants as indicated, during the following dates: August 28, 2013 (Defendant Brock); August 29, 2013; August 30, 2013 (Defendant Mahan); August 31, 2013; September 1, 2013 (Defendant Mahan); and September 2, 2013 (Defendant Mahan). *Id.* at 47, 56, 58, 62, 66, 70. Plaintiff largely focused on addressing his housing situation rather than his mental state. Brock Decl. ¶ 10. Plaintiff reported, "I'm suicidal" on a daily basis, but clinicians noted that he was frequently seen smiling, laughing, and engaging with staff. Mahan Decl., Ex. A at 35, 49-50, 58, 64-66, 69-70, 72. Plaintiff also requested a transfer to the DSH, and he threatened legal action against mental health providers when they suggested he raise his housing concerns with custody staff. Brock Decl. ¶ 10. Plaintiff reported that he would attempt suicide by taking pills if he were discharged from the MHCB, stating that "he doesn't have pills but plans to collect them." Mahan Decl., Ex. A at 68, 72. Mental health providers ultimately determined that Plaintiff was not demonstrating any indication of genuine depression or psychosis. *Id.* at 84; Brock Decl. ¶ 10. They concluded instead that Plaintiff was using suicidality to effect changes in his housing and custody situation. *Id.*

### 2) September 3, 2013 – Discharge from MHCB

On September 3, 2013 around 2:30 p.m., Plaintiff underwent his final IDTT review for his "discharge evaluation," and the team included Defendant Brock and another psychologist, Dr. M. Rowe.[6] Mahan Decl., Ex. A at 81, 83. The team drafted a one-page "Mental Health Crisis Bed Discharge Summary" and a two-page IDTT-Level of Care Decision, both dated September 3, 2013, in which the team determined that Plaintiff should be discharged from the MHCB. *Id.* at 82-84. Regarding Plaintiff's "Response to Treatment" at the MHCB, the team noted as follows:

> During his admission, there was no significant changes in

---

[6] The "Committee members" for the IDTT review for Plaintiff's "discharge evaluation" on September 3, 2013 also listed the following: Psychiatrist K. Rastegari; CCI D. Rocha; and Defendant Mahan. Mahan Decl., Ex. A at 81. However, the Court notes that only Defendant Brock and Dr. Rowe signed the IDTT Level of Care Decision dated September 3, 2013. *Id.* at 83.

[Plaintiff's] clinical presentation through he did begin to endorse "I'm suicidal" on a daily basis. He continually reported that he fears for his safety if returned to housing. During daily 1:1 contacts he specifically states "I'm still suicidal, nothing has changed. I'm [sic] won't go back to that building." He then asked to go to DSH. When various clinicians explained that housing & safety concerns need to be addressed with custody he began to threaten lawsuits against mental health providers stating "You guys will be held liable if I tell you my life is in danger and you still send me back to my building," then held up court documents [relating to] other people he has sued. Despite his threats of self-harm, there is no indication of genuine depression or psychosis and it's evident that this patient continues to use suicidality or the threat of such to achieve his ends with housing, custody, etc. Due to incongruency between his statements and his clinical presentation, along with a clear desire to affect his housing situation, he has reached maximum benefit at the MHCB and is appropriate for discharge.

*Id.* at 84. After his IDTT review, at 4:30 p.m., Plaintiff refused when he was asked to sign the "Nursing Summary and Discharge Instructions," which included the following summary: ". . . No injurious behaviors throughout in patient stay. Discharged to EOP/Ad-seg. Diagnosed [with] Adjustment D/O [Disorder] [with] Anxiety. [Plaintiff] stable and medically cleared to return to housing. Mental health follow up per treatment plan. [Plaintiff] acknowledged." *Id.* at 86 (brackets added).

### 3) September 3, 2013 – First Suicidal Thoughts After Discharge

On September 3, 2013 at approximately 6:00 p.m., during the escort back to his housing unit, Plaintiff told custody officers that he was still having suicidal thoughts and did not want to return to ad-seg. Van Loh Decl., Ex. B at 26-27. As a result, the officers took Plaintiff to the CTC, where he reported to nursing staff that he "did not want to go to ad-seg" and stated: "I'm suicidal." *Id.* at 26. Nursing staff noted that Plaintiff was "smiling while talking to staff," but nevertheless referred him for an MHCB admission evaluation. *Id.* at 27-28. Plaintiff was again placed on suicide precaution for the night and given a safety smock, safety blanket, as well as a safety mattress. *Id.* at 28. According to the Interdisciplinary Progress Notes from September 3, 2013 at 6:00 p.m. through September 4, 2013 at 8:30 a.m., Plaintiff displayed "no self-harm" during the periodic fifteen-minute checks while he waited to be evaluated. *Id.* at 28-32.

On September 4, 2013 at 8:30 a.m., Defendant Brock and Dr. Rowe, conducted a suicide-risk assessment of Plaintiff, concluding that both his chronic and acute risks of suicide were

"low." *Id.* at 33-34.  In the Suicide Risk Evaluation dated September 4, 2013, Defendant Brock

and Dr. Rowe noted as follows under the section labeled, "Justification of Risk Level:"

> CHRONIC RISK: [Plaintiff] has no personal or familial history of suicide attempts or SIB [Self-Injurious Behavior].  He has no major mental illness (prescribed Straterra only for ADHD), and several demographic and protective factors including a parole date in 2020 to which he feels positive about.  His Chronic risk appears LOW.

> ACUTE RISK:   Currently, there is no indication of genuine ideation/intent to self-harm.  He does not appear depressed, no evidence of a psychotic disorder, is not hopeless or despondent and is mainly focused on keeping himself safe.  It is clear he is utilizing some MH resources in an attempt to affect his housing situation due to perceived threats from custody staff in his building.  His self-reported OD appears dubious as there is no substantiating medical evidence.  His Acute risk appears LOW.

*Id.* at 34 (brackets added).  Plaintiff's "Treatment Plan" was as follows: "Return to housing with

5-day/24-hour follow up.  Consult with PC regarding ongoing issues with custody.  Refer to PBST

[Positive Behavior Support Team] if patient continues to utilize CTC to address custody/safety

issues." *Id.*   At approximately 9:00 a.m., Plaintiff was cleared for release from the CTC.  *Id.* at

35.

### 4)  September 4, 2013 – Second Suicidal Thoughts After Discharge

On September 4, 2013 at approximately 1:40 p.m., Plaintiff returned to the CTC because

he was again having suicidal thoughts.  *Id.* at 36.  He said, "I don't feel like living anymore.  No

one cares about me." *Id.*  Nursing staff noted that Plaintiff showed "no sign of injury" and was

smiling and talking with custody staff and other inmates.  *Id.* at 36-37.  Plaintiff was referred to

the MHCB for an admission evaluation, and he was again placed on suicide precaution pending

the evaluation.  *Id.* at 38.  According to the Triage & Treatment Services Flow Sheet from

September 4, 2013 at 1:40 p.m. through September 5, 2013 at 8:00 a.m., Plaintiff demonstrated no

distress and displayed "no self-harm."  *Id.* at 37, 39-43.  At approximately 8:00 a.m., Defendants

conducted another suicide-risk assessment of Plaintiff, and concluded that both his chronic and

acute risks of suicide were "low."  *Id.* at 44.  According to the Suicide Risk Evaluation dated

September 5, 2013, Defendants Brock's and Mahan's notes under the section labeled,

"Justification of Risk Level" are almost identical to the assessments made by Defendant Brock and

United States District Court
Northern District of California

1    Dr. Rowe the day before, on September 4, 2013.  *Compare id.* at 45 to *id.* at 34.  In sum, because

2    Plaintiff showed no change in his mental state or evidence of psychosis since his previous

3    discharge from the MHCB, his mood was stable, and he was future-oriented, Defendants again

4    concluded that Plaintiff's threat of suicide was not genuine.  *Id.* at 45.  Defendants cleared him to

5    return to his housing unit.  *Id.* at 42, 45-46.  According to the Interdisciplinary Progress Notes

6    dated September 5, 2013, Plaintiff did not seem to be cooperative when being moved out of his

7    CTC cell because at 9:05 a.m. "per custody [Plaintiff] [was] to be cell extracted [but] advised [he]

8    is mod[erate] to high risk for asthma," and at 10:25 a.m. "[Plaintiff] spoke to [Defendant] Brock

9    and agreed to come out of CTC 115 [and to be] ambulated back to D2 custody [his housing unit]."

10   *Id.* at 47 (brackets added).

11              **5)  September 5, 2013 – Suicidal Thoughts After Return to Housing Unit**

12              On September 5, 2013 at 11:00 a.m., after he was discharged from CTC but before custody

13   staff could remove Plaintiff from the holding cell, Plaintiff again "reported he was suicidal to a

14   passing RN [registered nurse]." *Id.* at 48-49.  Dr. Capre conducted another suicide-risk

15   assessment of Plaintiff.  *Id.*  Plaintiff reported that his suicide "plan" was to "fish for medications

16   and then OD," which meant that he intended to obtain medications from other inmates so that he

17   could OD.  *Id.* at 49.  Plaintiff added that he could also "cheek" his own medications, which meant

18   that he would not swallow his medications and instead keep them in order to take them all at once

19   and OD.  *Id.*  Dr. Capre notified custody staff that Plaintiff should be placed in a management cell

20   to prevent him from obtaining medications from other inmates, and she notified nursing staff that

21   Plaintiff might try to "cheek" his medication.  *Id.*  Dr. Capre noted that Plaintiff had no

22   documented history of suicide attempts, and that his claimed OD on August 23, 2013, was not

23   verified.  *Id.*  Dr. Capre further noted that Plaintiff had been stable between June 13 and the date of

24   his alleged OD on August 23, 2013, stating as follows:

25              From 6/13/13 to 8/23/13, while on this clinician's case-load,
                [Plaintiff] has been stable and had reported, "I don't have a mental
26              illness and do not have any MH symptoms.  All of my problems are
                with the Courts."  On 8/16/13, [Plaintiff] asked to be sent to DSH
27              because he has anger problems.  The following week, he was
                informed that he would not be send to DSH.  It is likely that
28              [Plaintiff] is reporting SI [suicidal ideation], intent, and plan because

United States District Court
Northern District of California

he wants to be sent to DSH.[7]

*Id.* (footnote and brackets added).  Dr. Capre concluded that both his chronic and acute risks of

suicide were "low."  *Id.*  According to the Suicide Risk Evaluation dated September 5, 2013, Dr.

Capre noted as follows under the section labeled, "Justification of Risk Level:"

> Chronic: Low: No documented history of suicide attempts.
> [Plaintiff] is future oriented.    [Plaintiff] participates in MH
> treatment.
>
> Acute: Low: After assessing [Plaintiff] and consulting with Dr.
> Brock (CTC) and Ms. Isaacs, Sgt. Garcia was notified that [Plaintiff]
> was cleared to return to his cell.   Approximately 15 minutes after
> clearing [Plaintiff] and while he was still in the holding cell,
> [Plaintiff] reported he was suicidal to a passing RN and another
> referral was generated.    This clinician met with [Plaintiff].
> [Plaintiff] reported that his thoughts of suicide were the same as
> when he was cleared at CTC and the same as 15 minutes earlier.
> [Plaintiff] was again cleared to return to his cell.

*Id.* (brackets added).  Plaintiff was referred to the Positive Behavioral Support Team "in order to

develop a specialized behavioral plan to keep [Plaintiff] safe as well as lessen his utilization of

MHCB."  *Id.* (brackets added).

At approximately 1:30 p.m., the same day, Plaintiff again stated that he was having

suicidal thoughts to custody staff.  *Id.* at 50-53.  Plaintiff was initially placed in a holding cell in

his housing unit, where another psychologist, Dr. J. Swearengin, conducted a suicide-risk

assessment.  *Id.* at 52.  Plaintiff reported that he would hang himself if returned to his cell, stating

to the clinician: "I'm suicidal, do your job and send me to CTC.  I'll hang myself."  *Id.*  Plaintiff

added that he "ha[d] the means to hang himself, denies having a cell-mate, and said he overdosed

on Strattera approximately one week ago."  *Id.* at 52.  After speaking with various custody staff

and mental health clinicians, Dr. Swearengin recommended that Plaintiff be taken to the CTC for

further evaluation.  *Id.* at 51-53.  Upon his arrival at the CTC, Plaintiff stated to nursing staff, "I'm

here because I didn't get my lunch."  *Id.* at 54.  He was referred for an MHCB admission

evaluation, placed on suicide precaution, and given a safety smock, safety blanket, as well as a

safety mattress.  *Id.* at 54-61.  According to the Triage & Treatment Services Flow Sheet and the

---

[7] During his deposition, Plaintiff testified that he wanted to transfer to the DSH in order to
spend more time "out of [his] cell" instead of being "stuck in a cell."  Plaintiff's Dep. 50:1-15.

United States District Court
Northern District of California

United States District Court
Northern District of California

Interdisciplinary Progress Notes from September 5, 2013 at 3:55 p.m. through September 4, 2013 at 8:30 a.m., Plaintiff displayed "no self-harm" during the periodic fifteen-minute checks while he waited to be evaluated.  *Id.* at 55, 57-62.

At approximately 9:30 a.m. on September 6, 2013, Defendant Mahan conducted a suicide-risk assessment of Plaintiff.  *Id.* at 63-64.  According to the Suicide Risk Evaluation dated September 6, 2013, Dr. Mahan noted as follows:

> [Plaintiff] was referred to TTA [Triage and Treatment Area] for evaluation after he made suicidal statement: "I'm suicidal, homicidal."  Custody reported that [Plaintiff] refused to follow directions following transfer to TTA.  [Plaintiff] described his mood as "good" with agitated affect.  [Plaintiff] stated, "I'm done with you dude," "I wanna go back, get the police and send me back to my housing" and refused to cooperate.  [Plaintiff] [was] informed that i[f] he wanted to go back to his housing he would need to cooperate with this interview.  [Plaintiff] stated he would pursue legal action if he was sent back to his housing, where he directly stated he wanted to go.  [Plaintiff] informed that he could try to purse legal actions and that that was his prerogative.  [Plaintiff] then stated he would [be] cooperative, but remained combative.  [Plaintiff] stated, when asked, "I'm suicidal," with a big smile on his face (apparently trying now to laugh), and stated, "now you have to admit me, man," "you underestimated how smart I am, bro."  Upon further inquiry, though, [Plaintiff] could not articulate his thoughts regarding self-harm.  [Plaintiff] indicated having no plan, or true intent.  [Plaintiff] has never tried to harm himself, and has stated in the past that he is simply using Mental Health in order to get his housing changed.  When asked about getting his housing changed, [Plaintiff] refused to respond to questions on this subject.   [Plaintiff] then made statements that he wanted to go back to housing.  When asked about his previous statements of being, "suicidal, homicidal," and whether or not he was still homicidal, [Plaintiff] indicated "that's not a problem anymore, man."  [Plaintiff] was encouraged to continue to follow custody directions.

*Id.* at 64.  Defendant Mahan cleared Plaintiff to "return to housing [unit] with 24 hour custody and five day Mental Health follow ups."  *Id.*

### 6)  Follow-up Evaluations

During the five-day follow ups from September 7, 2013 through September 11, 2013, Plaintiff did not attempt to commit suicide and reported to mental health staff that he was "good."  *Id.* at 66.

During the remainder of 2013, Plaintiff consistently denied having suicidal thoughts.  *Id.* at 66-95.

### 7)   Incidents of Alleged Suicidal Thoughts or Attempts in 2014 and 2015

In 2014, Plaintiff twice reported attempting suicide by overdosing on pills, and he was taken to an outside hospital.  *Id.* at 96.  His toxicology reports were negative, and the outside hospital reported that Plaintiff's stomach contents did not contain any type of medication or toxic substance.  *Id.*  Plaintiff was briefly transferred to the DSH in April 2014.  *Id.* at 102.  His medical records indicate that he was returned because of a "lack of symptoms observed."  *Id.*  Plaintiff reported that he was having suicidal thoughts on May 23 and 24, 2014, and medical providers noted that his frequent trips to the MHCB were related to his housing situation rather than genuine "suicidal ideation."  *Id.* at 98, 100.  On June 23, 2014, Plaintiff threatened to "go suicidal" if the custody staff did not give him soy milk because "I can get soy milk at the crisis bed since they will give it to me there."  *Id.* at 105.

In 2015, Plaintiff was again admitted to the MHCB after he reported that he had a plan to commit suicide by hanging himself with a bed sheet on July 25, 2015.  Van Loh Decl., Ex. B at 106.  Plaintiff "has reported multiple SAs [suicide attempts] in and out of prison (OD, cut himself, and hanging) with [the] most recent on 5/15 via OD on meds leading to MHCB placement."  *Id.*  However, as of September 3, 2015, Plaintiff's medical record shows "no verification of this or any other SA [suicide attempt] while incarcerated."  *Id.*

### B.    Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

United States District Court
Northern District of California

reasonable trier of fact could find other than for the moving party.  On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.  It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Id*.  If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

A district court may only consider admissible evidence in ruling on a motion for summary judgment.  *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).  In support of the motion for summary judgment, Defendants have presented their own declarations as well as a declaration from their attorney, Sara D. Van Loh, Esq., along with various supporting exhibits.  Dkts. 18-20, 23.[8]  Meanwhile, Plaintiff has filed his verified complaint and opposition. Dkts. 1, 24.  The Court construes his complaint as an affidavit under Federal Rule of Civil Procedure 56, insofar as it is based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

---

[8] Defendants have filed a "Notice of Errata re: Motion for Summary Judgment," in which they identified two errors in the documents submitted in support of the motion.  Dkt. 23.  These errors include: (1) a custodian-of-records declaration that contained a typographical error mistakenly identifying the declarant as "J. DeLaCruz," *see* Van Loh Decl., Ex. A; and (2) their Separate Statement of Undisputed Facts, which contained certain incorrect citations to the record, *see* Dkt. 17.  In ruling on the motion for summary judgment, the Court will consider: (1) the revised custodian-of-records declaration, properly identifying the declarant as "C. Hao," Dkt. 23-1 at 2; and (2) the Amended Separate Statement of Undisputed Facts, which contains correct citations to the record, Dkt. 23-2 at 2-9.

### C. Discussion

#### 1. Deliberate Indifference to Medical Needs Claim

The Eighth Amendment protects prisoners from inhumane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under section 1983. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976).

In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show "deliberate indifference" to his "serious medical needs." *Estelle*, 429 U.S. at 104. "This includes 'both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation omitted).

To meet the objective element of the standard, a plaintiff must demonstrate the existence of a serious medical need. *Estelle*, 429 U.S. at 104. A "serious medical need[]" exists if the failure to treat a prisoner's condition could result in further significant injury or the "[u]nnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (citing *Estelle*, 429 U.S. at 104), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment. *McGuckin*, 974 F.2d 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

To satisfy the subjective element, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. A Plaintiff must establish that the course of treatment the doctors chose was "medically unacceptable under the circumstances" and that they

embarked on this course in "conscious disregard of an excessive risk to [Plaintiff's] health." *See Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004) (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). A claim of mere negligence related to medical problems, or a difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment. *Id.*

Here, Plaintiff claims that Defendants were deliberately indifferent to his medical needs when they discharged him from the MHCB, "only to have him return after attempting to commit suicide on two more occasions . . . on September 3 and 4, 2013." Dkt. 1 at 3. Specifically, Plaintiff claims he "swallow[ed] pills" on September 3, and he "tr[i]ed d[y]ing by hanging" on September 4. *Id.*[9] Plaintiff claims that Defendants "purposely discharged [him] wrongfully because they needed more room for other inmates that were suicidal."[10] *Id.*

Meanwhile, Defendants argue that the "critical question" is whether Plaintiff has "provided sufficient evidence to show that he was suffering a mental health crisis requiring 24-hour inpatient hospitalization in September 2013." Dkt. 25 at 1. Defendants contend that even after reviewing Plaintiff's opposition, "the answer must be no." *Id.* Upon reviewing the papers and the evidence in this case, the Court agrees. As further explained below, this Court finds that because Plaintiff cannot show that he required inpatient hospitalization after he was discharged from the MHCB by Defendants in September 2013, he also cannot show that Defendants were deliberately indifferent to his serious medical needs by declining to keep him hospitalized.

---

[9] During his deposition, Plaintiff could not remember how he attempted suicide (i.e., he was "not sure" about the manner in which he attempted suicide) during the two incidents that occurred on September 3 and 4, 2013. Plaintiff's Dep. 70:6-83:7.

[10] In his opposition, Plaintiff also argues that Defendant Brock could not unilaterally discharge him from the MHCB because it he was "braking [sic] the rules & regulations" of the prison. Dkt. 24 at 3 (citing Ex. A, California Code of Regulations, Title 15, § 3365(a)(3) ("Discharge from suicide watch or suicide precaution shall occur when an interdisciplinary team of clinicians determines that the inmate no longer presents a suicide risk.")). However, the record shows that the decision to discharge Plaintiff on September 3, 2013 was made by the IDTT, which was a team that included Defendant Brock and Dr. Rowe. Mahan Decl.; Ex. A at 81-84. In any event, a violation of the prison's regulations, alone, would not support a constitutional claim. *See Ove v. Gwinn*, 264 F.3d 817, 824 (9th Cir. 2001) ("To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress.") (citations omitted).

18

### a. Serious Medical Need

While the medical records seem to be unclear as to whether or not Plaintiff had attempted suicide on August 23, 2013 (when he was initially admitted to the MHCB), *compare* Mahan Decl., Ex. A at 1 with *id.* at 2, 19, 40, it is not necessary for the Court to confirm whether this *August* 2013 incident occurred because it is not relevant as to whether Defendants' actions amounted to deliberate indifference when they discharged Plaintiff from the MHCB and caused him to allegedly attempt suicide in *September* 2013.

Upon careful review of Plaintiff's medical records, the Court finds that—contrary to his allegations in the complaint—Plaintiff did not attempt suicide or otherwise harm himself on the two other dates alleged on his complaint: September 3 and 4, 2013 (both after his discharge from the MHCB). *See* Van Loh Decl., Ex. B at 26-95. As such, Plaintiff has failed to submit evidence that he suffered any injury as a result of Defendants' conduct of discharging him, or that he faced a substantial risk of a serious injury after his discharge. Plaintiff has also failed to submit evidence suggesting that Defendants believed his discharge from the MHCB in September 2013 posed a substantial risk of serious harm. In both his complaint and opposition, Plaintiff speculates, without evidentiary support, that a lack of bed space led to his discharge, rather than a reasoned decision by medical staff. See Dkt. 1 at 3; Dkt. 24 at 7-8. By contrast, the evidence shows that Defendants (along with other mental health providers) exercised their professional judgment and concluded that Plaintiff was not experiencing a genuine mental health crisis, that he was not a danger to himself or others, and that he did not require 24-hour inpatient care at the MHCB. Even if the record shows that Plaintiff claimed to have suicidal *thoughts* (as opposed to *attempt* suicide) after being discharged, the record shows that Defendants provided adequate care to Plaintiff, as explained below.

First, Plaintiff alleges that he attempted suicide by swallowing pills on September 3, 2013 after his discharge from the MHCB. Dkt. 1 at 3. To the contrary, Plaintiff's medical records show that there was no suicide attempt on September 3, 2013, and instead, at approximately 6:00 p.m., during the escort back to his housing unit, Plaintiff told custody officers that he was still having suicidal thoughts and did not want to return to ad-seg. Van Loh Decl., Ex. B at 26-27. As a result,

United States District Court
Northern District of California

1    the officers took Plaintiff to the CTC, where he reported to nursing staff that he did not want to go

2    to ad-seg and stated: "I'm suicidal." *Id.* at 26. The triage nurse noted that Plaintiff was "smiling

3    while talking to staff" and had "no sign of injury." *Id.* at 26-27. He was placed in a holding cell

4    on suicide precaution from September 3, 2013, at approximately 6:00 p.m. until the following

5    morning. *Id.* at 28-32. At 8:30 a.m. on September 4, 2013, Defendant Brock and Dr. Rowe

6    evaluated Plaintiff and concluded that both his chronic and acute risks of suicide were low. *Id.* at

7    33-34. At approximately 9:00 a.m., they cleared Plaintiff for release back to his housing unit. *Id.*

8    at 35. Thus, the record shows that at no point during this time did Plaintiff attempt suicide or

9    harm himself by swallowing pills. *See id.* at 26-35.

10       Second, Plaintiff next alleges that he attempted suicide by trying to hang himself on

11   September 4, 2013, after returning to his housing unit. Dkt. 1 at 3. However, once again, his

12   medical records refute his claim. They demonstrate that on September 4, 2013 at approximately

13   1:40 p.m., Plaintiff returned to the CTC because he was again having suicidal thoughts. Van Loh

14   Decl., Ex. B at 36. Plaintiff made the statement: "I don't feel like living anymore. No one cares

15   about me." *Id.* Nursing staff noted that Plaintiff showed "no sign of injury," and he was smiling

16   and talking with custody staff and other inmates. *Id.* at 36-37. Plaintiff was referred to the MHCB

17   for an admission evaluation, and he was again placed on suicide precaution pending the

18   evaluation. *Id.* at 38. He demonstrated no distress and exhibited "no self-harm." *Id.* at 39-42.

19   Defendants evaluated Plaintiff the following morning, September 5, 2013, at approximately 8:00

20   a.m. *Id.* at 44. Because Plaintiff showed no change in his mental state or evidence of psychosis

21   since his previous discharge, his mood was stable, he was eating and sleeping normally, and he

22   was future-oriented, Defendants again concluded that Plaintiff's threats of suicide were not

23   genuine. *Id.* at 45. Defendants cleared him to return to his housing unit. *Id.* at 45-46. The record

24   shows that Plaintiff did not attempt suicide by trying to hang himself or otherwise harm himself at

25   any point on September 4, 2013. *Id.* at 39-40.

26       On September 5, 2013, Plaintiff twice reported that he was having suicidal thoughts, and

27   he was assessed by two different clinicians. *Id.* at 48-49, 50-53. After consulting with the MHCB

28   staff, the first clinician cleared Plaintiff to return to his cell at approximately 11:00 a.m. *Id.* at 48-

49.  Two hours later, another clinician evaluated Plaintiff after he again reported to custody officers that he was having suicidal thoughts.  *Id.* at 51-53.  Specifically, Plaintiff reported that "he is suicidal with a plan to hang himself with a sheet in his cell."  *Id.* at 53.  Thus, the record shows that Plaintiff did *not* attempt to hang himself; he just said that he had a *plan* to do so.  In an abundance of caution, the clinician instructed custody staff to escort Plaintiff to CTC where he was again referred for an MHCB evaluation and placed on suicide precaution.  *Id.* at 53, 56-57.  The record shows that Plaintiff did not attempt suicide by trying to hang himself or otherwise harm himself on September 5, 2013.  *Id.* at 57-62.

At approximately 9:30 a.m. on September 6, 2013, Defendant Mahan again evaluated Plaintiff for admission to the MHCB.  *Id.* at 63-64.  Plaintiff reported, "I'm suicidal," with a big smile on his face, apparently trying not to laugh.  *Id.* at 64.  He then stated, "Now you have to admit me, man," and "You underestimated how smart I am, bro."  *Id.*  But Plaintiff could not articulate his suicidal thoughts and acknowledged no plan or true intent.  *Id.*  Plaintiff then stated, "I'm done with you dude" and asked to be returned to his housing unit.  *Id.*  Defendant Mahan cleared him for release to his housing unit.  *Id.*  Plaintiff did not try to commit suicide after returning to his cell.  Mahan Decl. ¶ 10; Van Loh Decl., Ex. B at 66.  In the days following his discharge, Plaintiff reported to mental health staff that he was "good."  Van Loh Decl. Ex. B at 66.  For the remainder of 2013, Plaintiff consistently denied having suicidal thoughts.  *Id.* at 66-95.  In 2014 and 2015, while Plaintiff had instances of having suicidal thoughts and making (unverified) suicide attempts, the record shows that he continued to receive the requisite evaluations and mental health treatment following each instance, including admission at DSH in April 2014.  *Id.* at 96-106.  And, as mentioned above, as of September 3, 2015, Plaintiff's medical record shows no verification of any suicide attempt by Plaintiff during his incarceration.[11]  *Id.*

In his opposition, Plaintiff generally argues that the medical records are "unclear if [he]

---

[11] As mentioned above, Dr. Sardy's Suicide Risk Evaluation dated August 24, 2013 indicated that Plaintiff had a "recent serious suicide attempt."  Mahan Decl., Ex. A at 1.  However, Plaintiff's medical record contains no verification of such a suicide attempt prior to August 24, 2013, and, in any event, it does not affect the Court's analysis because Plaintiff has failed to submit evidence relating to the *more relevant* alleged suicide attempts in September 2013 after he was discharged from the MHCB.

hurt himself every time he was sent back to his cell" without referencing particular portions of the records or identifying a single instance where the records suggest that he suffered some injury after his discharge.  Dkt. 24 at 8.  Plaintiff also contends that Defendants' decision to discharge him is sufficient to establish a constitutional violation, regardless of whether or not he actually attempted to harm himself, because he potentially "could [have] hurt himself."  *Id.*  However, at a minimum, Plaintiff must show that he suffered some injury as a result of Defendants' conduct to state a constitutional claim.  *See Hudson v. McMillian*, 503 U.S. 1 (1992) (finding allegations of *de minimis* pain are insufficient to demonstrate deliberate indifference).  Whether Plaintiff theoretically could have hurt himself after being released from the MHCB does not amount to a constitutional violation.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . .  Factual allegations must be enough to raise a right to relief above the speculative level.") (citations omitted).

In sum, Plaintiff has put forth no evidence to demonstrate that he attempted suicide on September 4 or September 5, or that he was harmed in any way by Defendants' decision to discharge him from the MHCB in September 2013.  All Plaintiff has presented is a conclusory statement in his verified complaint that he attempted suicide on those dates.  *See* Dkt. 1 at 3. Under *Scott v. Harris*, 550 U.S. 372 (2007), "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.* at 380-83 (police officer entitled to summary judgment based on qualified immunity in light of video evidence capturing plaintiff's reckless driving in attempting to evade capture which utterly discredits plaintiff's claim that there was little or no actual threat to innocent bystanders).  After reviewing Plaintiff's medical records, the Court finds that no reasonable juror could conclude that Plaintiff repeatedly attempted suicide after he was discharged in September 2013.  Instead, as further explained below, the record shows that Plaintiff continued to receive adequate mental health treatment from Defendants, who evaluated him each time he expressed that

1    he was having suicidal thoughts.  Therefore, Plaintiff cannot show an objectively "serious"

2    medical need that required his placement in the MHCB.  *See McGuckin*, 974 F.2d 1059-60.

3                        **b.  Deliberate Indifference**

4            Even if he could have shown the existence of a serious medical need, Plaintiff has failed to

5    carry his burden of raising a genuine issue of fact to support his claim that Defendants' actions

6    rose to the level of deliberate indifference to his serious medical needs.  *See Farmer*, 511 U.S. at

7    837.  Although Plaintiff, in his complaint, alleges that Defendants discharged him "wrongfully"

8    and such actions led to his unverified suicide attempts or suicidal thoughts, *see* Dkt. 1 at 3, the

9    record reflects otherwise.  Plaintiff presents no medical evidence that any such injury was the

10   result of Defendants' actions.  Plaintiff's allegations in the complaint that Defendants' decision to

11   discharge him led to such injuries (or even theoretically could have led to suicide attempts) is

12   conclusory in nature and insufficient to create a genuine issue of fact.  *See Marks v. United States*,

13   578 F.2d 261, 263 (9th Cir.1978) ("Conclusory allegations unsupported by factual data will not

14   create a triable issue of fact.") (citation omitted); *see, e.g.*, *Toguchi*, 391 F.3d at 1058 (summary

15   judgment in favor of defendant doctor appropriate as to conclusory claim that doctor failed to

16   adequately respond to respiratory arrest because record showed otherwise and such conclusory

17   assertions insufficient to raise issue of material fact); *Arpin v. Santa Clara Valley Transp. Agency*,

18   261 F.3d 912, 922 (9th Cir. 2001) (finding the district court did not err in granting summary

19   judgment because plaintiff failed to meet her burden of proof of providing specific facts to show

20   that the force used was unreasonable).

21           Even if Plaintiff's repeated claims of having suicidal thoughts could constitute a

22   substantial risk of serious harm, it was the professional opinion of Defendants that Plaintiff was

23   not actually suicidal or a danger to himself when they discharged him in September 2013.  Brock

24   Decl. ¶ 15; Mahan Decl. ¶ 4.  The MHCB is "intended for inmates who, as a result of serious

25   mental illness, either pose a danger to themselves or others, or they cannot function without 24-

26   hour care."  Mahan Decl. ¶ 4.  As his medical records show above, Plaintiff was discharged from

27   the MHCB because his clinicians did not believe that he was a danger to himself or others, and he

28   did not require the 24-hour mental health care that the MHCB provides.  While he was admitted in

United States District Court
Northern District of California

23

the MHCB, Plaintiff "did not appear to be psychotic or decompensating," and "his affect was distinctly incongruent with his claims of depressed mood and suicidal ideation" as he "consistently stated that he was suicidal during this time—while smiling and laughing . . . ." Mahan Decl. ¶¶ 4, 11. Plaintiff was "focused not on his mental health, but on problems he was having with custody staff in [ad-seg]." *Id.* ¶ 4. His clinicians, including Defendants, concluded that Plaintiff was using suicidality to effect changes in his housing and custody situation, and did not reflect genuine "suicidal ideation." Brock Decl. ¶ 10; Mahan Decl. ¶¶ 4, 11; Van Loh Decl., Ex. B at 25, 34. Prior to their decision to discharge him from the MHCB, Defendants carefully considered whether Plaintiff was a danger to himself, and they concluded that he was not.[12] Plaintiff has made no showing that their course of action "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [his] health." *Toguchi*, 391 F.3d at 1058. Plaintiff may not agree with Defendants' decision to discharge him from the MHCB, but an inmate's disagreement with his medical treatment does not constitute deliberate indifference. *See id.* at 1058-60 (showing of nothing more than a difference of medical opinion as to need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference).

Accordingly, Plaintiff cannot prevail on his claim of deliberate indifference against Defendants, and they are entitled to summary judgment on this claim as a matter of law. *See Celotex*, 477 U.S. at 323. Therefore, their motion for summary judgment is GRANTED.

## 2. Qualified Immunity Defense

As an alternative basis for summary judgment, Defendants contend that they are entitled to qualified immunity. Dkt. 16 at 19-20. "Qualified immunity shields an officer from suit when she

---

[12] As explained above, the decision to discharge Plaintiff was based entirely on his clinical presentation, not on the *availability* of beds in the MHCB because had the beds been full, Plaintiff would have been kept under observation and transferred to an MHCB at a different institution. *See* Brock Decl. ¶ 6. Plaintiff admits that he was transferred to an MHCB at a different institution (California Health Care Facility) when the beds at SVSP's MHCB were full in March 2014. Plaintiff's Dep. 95:17-96:7.

1   makes a decision that, even if constitutionally deficient, reasonably misapprehends the law

2   governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

3   The issue of qualified immunity generally entails a two-step process, which requires the court to

4   determine first whether the defendant violated a constitutional right, and then to determine

5   whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

6       In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court modified the *Saucier* test

7   and "gave courts discretion to grant qualified immunity on the basis of the 'clearly established'

8   prong alone, without deciding in the first instance whether any right had been violated." *James v.*

9   *Rowlands,* 606 F.3d 646, 650-51 (9th Cir. 2010) (discussing *Saucier* standard after *Pearson*).   The

10  relevant, dispositive inquiry in determining whether a right is clearly established is whether it

11  would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

12  *Saucier*, 533 U.S. at 202; *see, e.g.*, *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049-50

13  (9th Cir. 2002) (court may grant qualified immunity by viewing all of the facts most favorably to

14  plaintiff and then finding that under those facts the defendants could reasonably believe they were

15  not violating the law).  In the instant case, the Court has concluded that Plaintiff's constitutional

16  rights were not violated.  Thus, viewing the record in the light most favorable to Plaintiff,

17  Defendants prevail as a matter of law on their qualified immunity defense because the record

18  establishes no Eighth Amendment violation.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

19  However, even if a constitutional violation occurred, these Defendants also remain entitled to

20  qualified immunity as to Plaintiff's deliberate indifference to medical needs claim.

21       While Plaintiff's right to be free from deliberate indifference to his serious medical needs

22  was clearly established in 2013, Defendants could have reasonably believed that their actions were

23  lawful.  Plaintiff has failed to put forth evidence to demonstrate that he attempted suicide on

24  September 4 or September 5, or that he was harmed in any way by Defendants' decision to

25  discharge him from the MHCB in September 2013.  Even if Plaintiff had suicidal thoughts after

26  his discharge, the record shows that he was immediately evaluated for admission in the MHCB

27  after each time he expressed such feelings, and that Defendants and his other mental health

28  providers exercised their professional judgment and concluded that Plaintiff was not experiencing

United States District Court
Northern District of California

United States District Court
Northern District of California

a genuine mental health crisis, that he was not a danger to himself or others, and that he did not require 24-hour inpatient care at the MHCB.  Plaintiff's claim that Defendants were deliberately indifferent for discharging him from the MHCB amounts to nothing more than a difference of opinion between medical staff and an inmate.  *Toguchi*, 391 F.3d at 1058-60; *Sanchez*, 891 F.2d at 242.  Thus, a reasonable medical staff member in the place of Defendants could have believed that such a decision did not violate Plaintiff's clearly established constitutional rights.  Accordingly, Defendants are entitled, as an alternative matter, to qualified immunity with respect to Plaintiff's deliberate indifference to medical needs claim.

## IV.  CONCLUSION

For the reasons outlined above, the Court rules as follows:

1.  Plaintiff's motion to strike Defendants' reply brief as untimely is DENIED.  Dkt. 26.

2.  Defendants are entitled to judgment as a matter of law on the merits of Plaintiff's Eighth Amendment deliberate indifference to medical needs claim as well as on these Defendants' qualified immunity defense.  Defendants' motion for summary judgment is GRANTED, and judgment will be entered in their favor.  Dkt. 16.

3.  The Clerk shall terminate all pending motions and close the file.

4.  This Order terminates Docket Nos. 16 and 26.

IT IS SO ORDERED.

Dated:  March 10, 2017

_____
YVONNE GONZALEZ ROGERS
United States District Judge